STATE v. ERNEST MEADOWS, DEFENDANT.

(Filed 12 January, 1968.)

**1. Assault and Battery § 5—**

The offense of felonious assault under G.S. 14-32 consists of an assault with a deadly weapon with intent to kill inflicting serious injury not resulting in death.

**2. Homicide § 1—**

An accused may not be placed in jeopardy for homicide until the death of the injured victim has occurred.

**3. Homicide §§ 4, 5—**

A specific intent to kill, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of murder in the second degree or manslaughter.

**4. Criminal Law § 23—**

A plea of guilty is equivalent to a conviction.

**5. Criminal Law § 26—**

If, after a prosecution for an offense, a new fact supervenes for which the defendant is responsible and which changes the character of the offense and, together with the previous facts, constitutes a new and distinct crime, a conviction of the first offense is no bar to an indictment for the other distinct crime.

**6. Criminal Law § 26; Homicide §§ 1, 12—**

Defendant, prior to his victim's death, pleaded guilty to an indictment charging a felonious assault, G.S. 14-32, and was sentenced therefor. Subsequently, upon the victim's death, defendant was indicted for murder in the second degree, and defendant entered a plea of *autrefois convict* to the charge. *Held:* Defendant's plea in bar of "former conviction" was properly overruled, since at the time of his conviction for felonious assault the defendant could not have been placed in jeopardy for homicide.

**7. Criminal Law § 176—**

Where defendant introduces evidence, only the correctness of the denial of the motion to nonsuit made at the close of all the evidence is presented on appeal.

**8. Homicide § 20—**

Evidence of the State tending to show that the defendant and the deceased had a quarrel in the defendant's yard, that the defendant got a shotgun from his house and fired at the unarmed deceased, wounding him in the neck, resulting in his death some four and one-half months later, *held* sufficient to be submitted to the jury on the issue of defendant's guilt of murder in the second degree or of manslaughter.

**9. Homicide § 13—**

When the evidence of the State amply supports a jury finding that the defendant intentionally shot the deceased with a deadly weapon and thereby proximately caused his death, the presumptions arise that the killing was unlawful and with malice, constituting the offense of murder in the second degree.

**10. Criminal Law §§ 75, 86—**

Under the decision of *Miranda v. Arizona,* 384 U.S. 436, it is clear that an involuntary or not properly qualified confession may not be used to impeach a defendant who takes the stand in his own behalf.

**11. Same—**

Evidence of the State that the defendant, surrounded by family and friends in his yard, made inculpatory statements, amounts to a confession to police officers immediately following the shooting of the deceased by defendant, *held* properly admitted in evidence to impeach the testimony of defendant on trial, although the officers failed to advise de-

fendant of his rights as required by *Miranda v. Arizona*, it appearing that the statements were the result of a general police investigation to determine if a crime had been committed, and not the result of an in-custody interrogation.

**12. Assault and Battery § 17—**

A judgment imposing a prison sentence of five years upon a conviction of felonious assault is authorized by G.S. 14-32.

**13. Homicide § 30—**

A judgment imposing a prison sentence of not less than 12 nor more than 15 years upon conviction of manslaughter is authorized by G.S. 14-18.

**14. Criminal Law § 140—**

Where the court enters separate judgments imposing sentences of imprisonment and each judgment is complete within itself, the sentences run concurrently as a matter of law in the absence of a provision to the contrary in the judgment.

**15. Criminal Law §§ 138, 146—**

Defendant pleaded guilty to a charge of felonious assault and began a sentence of five years imprisonment. Upon the death of the victim of the assault, defendant was convicted of manslaughter and sentenced to a period of imprisonment for not less than 12 nor more than 15 years, the sentence to run concurrently with the first. *Held:* The Supreme Court, in the exercise of its general supervisory jurisdiction, North Carolina Constitution Art. IV, § 10, orders that the defendant be given credit for the time served under the first sentence of imprisonment in computing the length of imprisonment in the judgment for manslaughter.

APPEAL by defendant from *McLaughlin, J.,* October-November 1966 Session of UNION.

At February 1966 Session, the grand jury of Union County returned a bill of indictment charging that defendant on February 5, 1965, murdered one Ellis Newman. At February 1966 Session, Gambill, J., appointed Koy E. Dawkins, Esq., of the Union County Bar, to represent defendant in respect of said murder indictment. At May 1966 Session, Mr. Dawkins, representing defendant, before entering any other plea, entered a plea of "former conviction" to said murder indictment and filed a brief in support of this plea. Thereafter, by order of Brock, J., dated May 4, 1966, the court, being advised that "the family" of defendant had retained other counsel to represent him, permitted Mr. Dawkins to withdraw from the case. Defendant's said plea of "former conviction" was heard by Brock, J., at said May 1966 Session. His order overruling defendant's plea of "former conviction" is based on the findings of fact set forth therein, to wit:

"That on February 5, 1965, during an altercation in the home of the defendant, the deceased, Ellis 'June' Newman, was allegedly shot with a shotgun by the defendant; that a warrant was issued and a

Bill of Indictment returned at the May 1965 Session charging the defendant with a felonious assault on Ellis 'June' Newman with a deadly weapon, to wit, a 12 gauge shotgun, with intent to kill Ellis 'June' Newman, inflicting serious bodily injury not resulting in death; that at the May 1965 Session the defendant, through counsel, entered a plea of guilty as charged and was sentenced by the presiding Judge to a term of five (5) years in the State Prison; that thereafter on the 31st day of May, 1965, Ellis 'June' Newman died allegedly as a result of the gunshot wound received on February 5, 1965; that at the February 1966 Session of Superior Court of Union County the Grand Jury returned a true bill charging the defendant with the murder of Ellis 'June' Newman, and the case was set for trial at the May 2, 1966, Session."

Defendant excepted generally "(t)o the foregoing findings of fact, conclusions of law and entry of the foregoing order denying defendant's plea in bar . . ."

After the entry of Judge Brock's order, and by and with the consent of the solicitor, trial of defendant on said murder indictment was continued for the session.

Trial on said murder indictment was before McLaughlin, J., and a jury, at said October-November 1966 Session. Defendant was represented by Byron E. Williams, Esq., privately retained counsel. The jury returned a verdict of guilty of manslaughter. Thereupon, the court pronounced judgment imposing a prison sentence of not less than twelve nor more than fifteen years. Defendant excepted and gave notice of appeal.

Orders entered by McConnell, Resident Judge, in July and August, 1967, provide: (1) Failure to perfect the appeal in apt time was "through no fault or neglect on the part of the indigent defendant," and defendant was allowed to perfect his appeal; (2) R. Roy Hawfield, Esq., a member of the Union County Bar, was appointed counsel for defendant, an indigent, to perfect the belated appeal; and (3) Union County was required to pay the costs of mimeographing the record and defendant's brief incident to his appeal.

*Attorney General Bruton, Assistant Attorney General McDaniel and Staff Attorneys Jacobs and Wood for the State.*
*R. Roy Hawfield for defendant appellant.*

BOBBITT, J. Defendant assigns as error the overruling of his plea of "former conviction" by Brock, J., at May 1966 Mixed Session.

Defendant based his plea of "former conviction" on the fact the indictment for felonious assault to which he pleaded guilty at May 1965 Session, and the indictment for murder returned at February

1966 Session and on which defendant was tried at the October-November 1966 Session, arose out of the same transaction, namely, the alleged shooting of Ellis Newman by defendant on February 5, 1965.

Defendant pleaded guilty to the said crime of felonious assault and was sentenced therefor prior to May 31, 1965, the date of the death of Ellis Newman.

Although identical in respect of certain elements, the crimes charged in the two bills of indictment are distinct offenses both in law and in fact.

The crime of felonious assault, created and defined by G.S. 14-32, consists of these essential elements: (1) An assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, (5) *not resulting in death. State v. Hefner*, 199 N.C. 778, 155 S.E. 879; *State v. Birchfield*, 235 N.C. 410, 70 S.E. 2d 5; *State v. Jones*, 258 N.C. 89, 128 S.E. 2d 1.

In felonious assault, "(t)he injury must be serious but it must fall short of causing death." *State v. Jones, supra.* Too, a specific intent *to kill* is an essential element of felonious assault. *State v. Ferguson*, 261 N.C. 558, 135 S.E. 2d 626.

With reference to the murder indictment, this statement by Mr. Justice Van Devanter in *Diaz v. United States*, 223 U.S. 442, 32 S. Ct. 250, 56 L. Ed. 500, is apposite: "The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense."

The trial on said murder indictment was for second degree murder or manslaughter as the evidence might warrant. "A specific intent *to kill*, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter." *State v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322.

"If, after a prosecution for an offense, a new fact supervenes for which the defendant is responsible, and which changes the character of the offense, and, together with the previous facts, constitutes a new and distinct crime, an acquittal or conviction of the first offense is no bar to an indictment for the other distinct crime." 1 Wharton's Criminal Law and Procedure, § 145, p. 353. Accord: 21 Am. Jur. 2d, Criminal Law § 186; 22 C.J.S., Criminal Law § 287c, p. 753.

A plea of guilty is "equivalent to a conviction." *State v. Brinkley*, 193 N.C. 747, 138 S.E. 138; *Harrell v. Scheidt, Comr. of Motor*

*Vehicles,* 243 N.C. 735, 92 S.E. 2d 182; *State v. Stone,* 245 N.C. 42, 95 S.E. 2d 77.

The plea in bar asserted by defendant is *autrefois convict,* "formerly convicted." Decision on this appeal relates exclusively to such plea. We do not consider or decide whether an acquittal of defendant after trial on the felonious assault bill of indictment would constitute a bar to the subsequent prosecution for homicide.

In *Commonwealth v. Vanetzian,* 350 Mass. 491, 215 N.E. 2d 658 (1966), a defendant, prior to the victim's death, was indicted for assault and battery by means of a dangerous weapon, and pleaded guilty to and was sentenced for this criminal offense. Subsequently, when placed on trial for murder, the defendant pleaded *autrefois convict.* In overruling defendant's said plea, the Supreme Judicial Court of Massachusetts, in opinion by Spalding, J., said: "Both the common law and our statutes provide that a person may not be twice put in jeopardy for the same offence. (Citations.) But it is clear that this principle can have no application where, as here, at the time of the first indictment the facts upon which the second indictment is based had not yet occurred. (Citations.)"

In *Commonwealth v. Maroney,* 417 Pa. 368, 207 A. 2d 814 (1965), the defendant, prior to the victim's death, had pleaded *nolo contendere* to an indictment charging aggravated assault and robbery. Later he was indicted and adjudged guilty of murder in the first degree and sentenced to life imprisonment. In *habeas corpus* proceedings, he sought relief on the ground his plea of *nolo contendere* to aggravated assault and robbery constituted a bar to the subsequent prosecution for homicide. In rejecting defendant's plea of *autrefois convict,* the Supreme Court of Pennsylvania, in opinion by Eagen, J., said: "If, on the day he was convicted of aggravated assault and battery, the victim had already died and the appellant was *then* guilty of murder, his prosecution and conviction for the assault and battery would have barred his subsequent prosecution for murder. . . . However, when the first conviction occurred, the appellant was not then guilty of murder and could not have been prosecuted for that crime, since no such crime had as yet been committed. When the death occurred, a new and distinct crime was consummated for which he was not before guilty or prosecuted. The case of *Commonwealth v. Ramunno,* 219 Pa. 204, 68 A. 184, 14 L.R.A., N.S., 209 (1907), is factually identical and controlling."

Decisions in accord include the following: *State v. Wilson,* 85 Ariz. 213, 335 P. 2d 613; *State v. Randolph,* 61 Idaho 456, 102 P. 2d 913; *Hill v. State,* 149 S.W. 2d 93 (Tex.); *Powell v. State,* 42 So. 2d 693 (Ala.); *State v. Wheeler,* 173 La. 753, 138 So. 656. No decision reaching a contrary result has come to our attention. Both reason

and authority support Judge Brock's ruling in respect of defendant's said plea of "former conviction."

Defendant also assigns as error the denial of his motion(s) for judgment as in case of nonsuit. Defendant having offered evidence, the only question is whether the court erred in the denial of the motion made by defendant at the close of all the evidence. G.S. 15-173; *State v. Leggett,* 255 N.C. 358, 121 S.E. 2d 533.

The State's evidence consists of the testimony of Elree Robinson, Elgee Gray, Ben Stewart, and Eugene F. Hamer.

The testimony of Dr. Hamer, a medical expert, relates solely to the injuries sustained by Newman on February 5, 1965, and the cause of his death on May 31, 1965. Dr. Hamer testified: "The cause of (Newman's) death on May 31, 1965, was from complications, indirectly as a result of the gunshot wound of the neck which caused total paralysis from the neck down. The wound was on his neck, on one side."

Robinson testified in substance as follows: Robinson, "half-brother" of defendant, drove his car to defendant's house on Friday, February 5, 1965, about 10:00 p.m., in order to try to crank defendant's car. Newman went with him. Robinson parked his car in defendant's yard in position to connect jumper cables to the batteries of the two cars. While they were trying, unsuccessfully, to crank defendant's car, Newman and defendant "had some words about a hat." Newman told defendant he had better leave the car alone; that he could crank it the next day when they came home from work; and that defendant had been "in some of that man's gin anyway" and would not know what he was doing that night. Defendant then left, saying, "Wait a minute, I'll be right back." Defendant went into the house, came to the door with a shotgun, fired it once, the load from the gun hitting Newman in the neck. When shot, Newman was "beside the car," facing Robinson. Robinson asked defendant what was wrong. Defendant cursed and went back into the house. He came out again, without the shotgun, and said, "The damn rascal ain't dead?" Robinson replied, "No, he's not dead." Robinson asked Newman whether he could help him. Newman said, "No," and "slid back by the car with his head against the left wheel of (defendant's) car." The porch light at defendant's house was on. Newman did not have a knife in his hand. Robinson did not see Newman "have a piece of iron or hammer." After the shooting, Robinson "ran over to (his) mother's and had her call an ambulance and the Police Department." Two police officers answered the call.

Gray and Stewart, police officers, testified in substance as follows: Upon arrival, they found Newman lying on the ground, lean-

ing back against some old tires and the front wheel of a car that was parked in the yard. Newman was shot in the neck. He was "bleeding in the back of the neck where there was a wound." Newman "was talking but not moving any." Stewart, on cross-examination, testified: "I remember seeing a hammer somewhere but not where Newman was. I think there were about three or four feet between the porch and the car. It seems to me there was a hammer on the porch." Gray, under cross-examination, testified: "I did not see any hammer."

Defendant's evidence consists of his own testimony. He testified in substance as follows: He had told Robinson, "(his) brother," to come to his house Friday night, February 5, 1965, to help him start his car. Robinson got there about 10:30 p.m., accompanied by Newman. Defendant's car was "about three feet" from his porch. Defendant took his tool box, went to his car, "took the hammer and pounded the wire on the post of the battery," and then "laid the hammer down on the fender of the car." Robinson was in his car, "with the lights on and the motor running." Newman switched on the motor of defendant's car. Whereupon defendant hollered, "I ain't ready yet," and "Man, are you crazy?" The fan on the motor had cut defendant's wrist. Whereupon Newman cursed defendant and his car. Defendant told Newman to leave. Newman refused and said, "I want to whip hell out of you anyhow." While Newman was cursing, abusing and threatening defendant, defendant went to his house and was standing in the door. The shotgun "was setting right beside of the door facing as you come in the door." Defendant got his shotgun with his left hand. Newman came up on defendant's doorstep. Defendant told him "to go on." When Newman put his foot on the porch and drew the hammer back, defendant grabbed the shotgun and shot him. Defendant testified: "When I come down with the gun, he was coming down with the hammer." He also testified: "He was coming on me in my house, and I was not able to do anything with a man like that in my condition and him with that hammer coming at me." Defendant testified that "(a)bout seven months before (he) had two ribs removed and a lung operation," and that his back was broken in the service and he was still on crutches.

There was ample evidence to support a jury finding that defendant intentionally shot Newman with a deadly weapon, to wit, a shotgun, and thereby proximately caused Newman's death. Upon such finding, two presumptions arise: (1) That the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree. *State v. Gordon, supra.* This being so, defendant's motion for judgment as in case of nonsuit was properly denied.

After defendant had testified, the State recalled Gray and Stewart. Defendant assigns as error the admission of their testimony, upon recall, as to statements made by defendant at the scene of the shooting.

Their testimony tends to show that these officers had received a call that a shooting had occurred at 718 Boyce Street; that they proceeded to this address to investigate; that, upon arrival, they found Newman, shot "on the neck with a shotgun," bleeding, in defendant's yard; that "there were several persons around there," including defendant's "brother"; and that defendant was there and talked with them.

Stewart testified he asked defendant what had happened, and that defendant replied, "I shot him"; that, when asked why, defendant stated he had told Newman to leave; and that when asked about the weapon, defendant and Gray went to the back bedroom of defendant's house and got the shotgun. In further conversation, according to Stewart, "after the ambulance come to take (Newman) away," defendant told Stewart that Newman "had a knife on him — that he pulled a knife." Stewart testified he saw no knife.

When defendant's counsel objected to testimony by Stewart as to what defendant told him, the court inquired of Stewart: "Was (defendant) a suspect at that time?" Stewart answered: "I didn't know what happened. When I got there — I asked him what happened and that's when he told me." Thereupon, the court, apparently basing his ruling on his finding that defendant was not "a suspect" at that time, overruled defendant's objection and admitted the testimony of Stewart summarized above.

Gray, when asked by the court whether defendant was a suspect *at the time of the investigation,* answered, "Yes, sir." Defendant's objection to this question by the court was overruled and defendant excepted. Whereupon, the solicitor asked: "What did you (Gray) say to him (defendant)?" No objection was interposed by defendant. Defendant answered: "When I walked up to the house where Ernest was, Ernest said he shot 'Jum' on account of a hat he had borrowed." Defendant made no motion to strike this unresponsive answer.

The testimony of defendant that he shot Newman, and the testimony of Stewart, *upon recall,* that defendant advised him at the scene of the shooting that he had shot Newman, are in full accord. Statements attributed to defendant that Newman had had a knife and that he had shot Newman "on account of a hat he had borrowed" are in conflict with defendant's testimony at trial. Hence, to whatever extent it may be considered prejudicial, the impact of this testimony bears upon defendant's credibility as a witness.

.

Prior to the decision of the Supreme Court of the United States in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R. 3d 974, the rule supported by the weight of authority was "that an involuntary or not properly qualified confession may not be used to impeach an accused person who takes the witness stand in his own behalf . . ." Annotation, 89 A.L.R. 2d 478, pp. 479-480. Under *Miranda,* it seems clear an involuntary or not properly qualified confession or admission may not be used as evidence for any purpose.

Ordinarily, the failure of defendant's counsel to move to strike Gray's unresponsive answer would be sufficient to dispose of defendant's assignment of error (unsupported by an exception) with reference thereto. However, we prefer to consider the challenged evidence on the merits rather than on procedural grounds.

There is no contention that defendant was warned as to any of the constitutional rights set forth in *Miranda* prior to making the statements attributed to him. The question is whether, under the circumstances, such warning was necessary.

In *Miranda,* the majority opinion, delivered by Mr. Chief Justice Warren, states that the constitutional issue decided "is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way." Repeatedly, reference is made to "custodial interrogation." Thus, the opinion states: "(T)he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The opinion stated further: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo v. Illinois,* 378 U.S. 478, 492, 12 L. Ed. 2d 977, 986, 84 S. Ct. 1758. . . . Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." The opinion also states: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

As stated in *Gaudio v. State*, 1 Md. App. 455, 230 A. 2d 700: "In the opinion (in *Miranda*) the Court discussed 'custodial interrogation' at great length and the dangers against which the specific procedural safeguards are a shield were more definitively set forth in the discussion explaining the meaning above stated. The four cases decided by *Miranda* shared salient features, among which was 'incommunicado interrogation of individuals in a police-dominated atmosphere.' The Court referred to the Wickersham Report in the early 1930's and to the 'third degree' which flourished at that time and to cases thereafter decided by the Court in which police resorted to 'physical brutality — beatings, hanging, whipping — and to sustained and protracted questioning incommunicado in order to extort confessions.' It found that the use of physical brutality and violence is not relegated to the past or to any part of the country and stated that, 'Unless a proper limitation upon custodial interrogation is achieved — such as these decisions will advance — there can be no assurance that practices of this nature will be eradicated in the foreseeable future.' It stressed that the modern practice of in-custody interrogation is psychologically rather than physically oriented so that coercion can be mental as well as physical. It referred to police manuals and texts in which police officers are told that the 'principal psychological factor contributing to a successful interrogation is privacy — being alone with the person under interrogation.'"

"In-custody interrogation" is not involved in the factual situation here considered. Defendant was at his own home. He was living with his wife, his three children and his wife's mother. Robinson, his brother or half-brother, was present. Newman was lying in his yard. Others, presumably neighbors, had gathered at the scene of the shooting.

Defendant was not under arrest or in custody when the statements attributed to him were made. As to whether defendant was then a "suspect," the only reasonable conclusion to be drawn from the evidence is that defendant was then suspected, indeed it was manifest, that he, on his own premises, had shot Newman. The officers were seeking information as to the circumstances to determine whether and, if so, by whom, a crime had been committed. Whether they would conclude a crime had been committed depended upon the results of their investigation. Defendant was not taken into custody until after the officers had completed their investigation.

A general investigation by police officers, when called to the scene of a shooting, automobile collision, or other occurrence calling for police investigation, including the questioning of those present, is a far cry from the "in-custody interrogation" condemned in *Miranda*. Here, nothing occurred that could be considered an "incom-

municado interrogation of individuals in a police-dominated atmosphere." Defendant's assignment of error with reference to the testimony of the officers as to statements made by defendant at the scene of the shooting is without merit.

The views expressed herein are in accord with those stated in the following cases: *Duffy v. State,* 243 Md. 425, 221 A. 2d 653; *Gaudio v. State, supra; Dixon v. State,* 1 Md. App. 623, 232 A. 2d 538; *Ison v. State,* 200 So. 2d 511 (Ala.); *State v. Phinis,* 199 Kan. 472, 430 P. 2d 251.

In *Ison v. State, supra,* police officers stopped behind a car and found therein a person who was slumped over and had been shot in the head. One of the officers attended the wounded man while the other contacted police headquarters over the police car radio. The officer attending the wounded man testified that defendant approached with a pistol in his hand and in response to a question as to whether he had done the shooting made the inculpatory statement that he had shot the deceased. The Court, in opinion by Harwood, J., said: "We can conceive of no set of circumstances where it could be more unlikely that a statement by a person was coerced, than in the present situation where that person left his home, approached an investigating officer, and while standing in his own yard with a pistol in his hand, and not yet even in custody, replied to a question by the officer then engaged in ministering to a wounded man, as to whether he had shot the victim."

In *State v. Phinis, supra,* the sheriff, in response to a call, went to a service station and talked with one Hill who had been injured. The sheriff took Hill to a medical center for treatment of his injury, apparently a gunshot wound. Thereafter the sheriff and a patrolman went to a cabin occupied by the defendant and three others. During general questioning by the officers, in the course of their investigation, defendant stated she had fired a shot into the floor to scare Hill, who had been drinking and refused to leave, but that the bullet did not hit Hill. After their general investigation, the officers took defendant and one of the other occupants to the police station. With reference to testimony as to statements made by defendant during the general investigation at the cabin, the Court said: "At that stage of the investigatory process the general inquiry was of a nature and for the purpose of determining if a crime had been committed upon the person of Eddy Hill who claimed he had been shot by someone in the cabin. The nature of the crime had not been determined and the inquiry into such had not focused on any particular suspect. Clearly the investigation was not the custodial interrogation referred to in *Escobedo* and *Miranda.* The surroundings or place of the investigation, the circumstances giving rise to the in-

quiry and the presence of friends of the defendant indicate it was an 'on-the-scene' investigation. No advice of rights was required at that step of the investigation. The officers were not certain a crime had been committed by anyone."

For a comprehensive discussion of the impact of *Miranda* on police practices, see article by Thomas C. Lynch, Attorney General of the State of California, 35 Fordham Law Review 221 *et seq.*

The judgment for felonious assault pronounced at said May 1965 Session, which imposed a prison sentence of five years, is authorized by G.S. 14-32; and the judgment for manslaughter pronounced at said October-November 1966 Session, which imposed a prison sentence of not less than twelve nor more than fifteen years, is authorized by G.S. 14-18. Each judgment is complete within itself; and, there being no order to the contrary, the two sentences run concurrently. *State v. Efird,* 271 N.C. 730, 157 S.E. 2d 538, and cases cited. However, defendant had served a portion of the sentence imposed in the felonious assault case prior to pronouncement of judgment in the manslaughter case. This question arises: Is defendant entitled to credit for the time served during this period in computing the length of the sentence he is required to serve in the manslaughter case?

We are confronted with this anomalous situation. In the felonious assault case, it is established that the shooting of Newman by defendant did not result in Newman's death; but in the manslaughter case, it is determined that the very same shooting of Newman by defendant did cause Newman's death. The situation is one of rare occurrence. Under the circumstances, this Court, in the exercise of its "general supervision and control over the proceedings of the other courts," conferred by Article IV, Section 10, of the Constitution of North Carolina, holds that defendant should be given credit for the time so served in computing the length of his imprisonment on the manslaughter sentence. Hence, the judgment of the court below is so modified; and it is directed that an order be entered in the superior court referring to said modification by this Court of the judgment pronounced at October-November 1966 Session and ordering that a modified commitment be issued in the manslaughter case in accordance therewith.

We find no error in the trial below. However, the judgment is modified as stated herein.

No error in trial — judgment, as modified, affirmed.