State v. Bell

STATE OF NORTH CAROLINA v. ALVIN THOMAS BELL

No. 60

(Filed 1 June 1973)

Rape § 5— sufficiency of evidence to withstand nonsuit

Evidence in a rape case was sufficient to withstand defendant's motion for nonsuit where it tended to show that the victim identified defendant as her assailant, tracks leading from the victim's backdoor to the home of defendant's parents were made by defendant's shoes which he was wearing at the time of his arrest one day after the alleged offense, defendant admitted having had intercourse with the victim on the day in question but claimed that the victim had consented, and the victim's appearance immediately after the alleged offense supported her testimony that defendant had tied her to a bed, put a gag around her face, ripped off her clothing and had intercourse with her.

State v. Bell

APPEAL by defendant under G.S. 7A-27(a) from *Tillery, J.,* October 1972 Session of SAMPSON Superior Court.

Defendant was indicted in separate bills, (1) for the rape of Mrs. Rosa Mae Rominger, and (2) for the armed robbery of Mrs. Rominger, on 21 June 1972. He entered pleas of not guilty and the indictments were consolidated for trial.

The State's evidence, summarized except when quoted, tends to show the facts narrated below.

Mrs. Rominger, age 71, was a widow. She lived in a house on the White Lake Road (Highway 701) about three miles from Clinton.

On 21 June 1972 about 5:00 p.m., while in her living room sewing, Mrs. Rominger's attention was attracted by the sound of rocks thrown against her house. After an investigation at the front of the house, she returned to the living room and picked up her sewing. A brickbat, thrown through a windowpane, shattered glass upon the living room floor. On her way to shut the back (kitchen) door, Mrs. Rominger was confronted by a man (later identified as defendant) who was standing at the corner of the kitchen table. The man threw his left arm around her neck, cupped his hands over her mouth, and said, "Don't move." Loosening his hand, he said, "If you holler, I'll kill you." He had an open switchblade knife in his hand. A green rag was over his nose and mouth and was tied behind his head.

The intruder grabbed Mrs. Rominger from behind, tied her wrists and pulled her backwards into the back bedroom. There he picked her up and laid her on the bed. He then "tied ropes to the bed railings and . . . tied some around [her] ankles and tied them to the bed." Loosening the gag he had tied around her mouth, the intruder said: "Now, tell me where your money is, if you don't I will kill you. I've killed before and I'll do it again." Mrs. Rominger told him that what money she had was in a white purse behind the big easy chair in the corner of *her* (the other of the two bedrooms) bedroom. The intruder then went into *her* bedroom, stayed about five minutes, and upon his return stated he had found the money.

The intruder then untied Mrs. Rominger's feet, whirled her over on her face, and ripped off all her clothing from her belt down. Her clothes included "a pair of red britches." Then he threw her over on the bed and had sexual intercourse with her notwithstanding her protest and pleading. During this time,

the intruder's only comment was that he would cut Mrs. Rominger's throat if she did not "go along with him." Upon the completion of the act of sexual intercourse, he loosened the rope on Mrs. Rominger's right hand and left. Her left hand was still tied to the bed and the gag was around her face. As soon as she could get loose, she put on her clothes, and crossed the road to the house of neighbors. They called the sheriff's office.

Mrs. Rominger testified that, although the intruder never took off his mask, she observed his hair and the upper portion of his face when "he turned [her] around and tied the ropes around [her] arms"; that, although she had seen him pass up and down the road, he had never been in her house; and that she did not know his name and had never spoken to him. In reporting to the officers, she described her assailant as "an Indian male, medium to short length curly hair, approximately five nine or five ten, weighing from a hundred and seventy to a hundred eighty pounds, wearing a greenish colored trouser, greenish to brown . . . had a three cornered piece of cloth tied around the lower portion of his face . . . [and] definitely [had] black hair."

There was evidence tending to show that before and after the officers arrived Mrs. Rominger "was highly emotional and excited"; that her hair was "all messed up"; that she was barefooted, this being the only time a neighbor had ever seen her barefooted; and that the red pants or slacks she was wearing were inside out and on backwards.

There was evidence tending to show that an examination made by Dr. John W. Nance on the evening of 21 June 1972 disclosed that she had been penetrated in recent sexual intercourse; that there was a small recent tear at the back of the vagina and slight bleeding of the lining of the vagina; that sperm was found in her vagina; and that positive red marks circled her right wrist and partially circled her left wrist.

There was testimony, offered for consideration only as corroborative evidence, tending to show that statements made by Mrs. Rominger to Dr. Nance and to officers were substantially in accord with her testimony at trial.

Upon his arrival at Mrs. Rominger's house about 6:15 p.m., Sheriff James Tew attempted "to rope off or seal off the area" by posting men to keep people from running in and out. He undertook particularly to save a footprint he observed at the back

door. Mrs. Rominger was at the house across the road but returned with Sheriff Tew to her own house. They were met there by S.B.I. Agent William Edward Hunt, Deputy Sheriff George Chase and other officers. Chase entered the front door after Mrs. Rominger unlocked it. About the same time the sheriff entered the back door. They found no one in the house. The immediate area was searched and arrangements were made for plaster of paris to be poured into tracks leading from the back of Mrs. Rominger's house.

Mrs. Rominger was then taken to the hospital for examination by Dr. Nance. After this examination, which lasted an hour or more, the officers took Mrs. Rominger home from the hospital. Upon arrival, they made "a crime scene investigation at the house and the nearby area." They found the bed in the back bedroom "was disarranged, messed up, [and saw] a rope tied to the right corner post on the right-hand side [and] another rope lying upon the bed which was tied to the railing on the left-hand side." Both ropes were tied at the head of the bed. The pieces of rope on the bed and the brick in the living room were identified by Mrs. Rominger.

Tracks led from the back of Mrs. Rominger's house through fields and woods to the vicinity of the home of defendant's parents. This house was under continuous surveillance and officers patrolled the highways in the area. The next day, 22 June 1972, about 7:00 p.m., defendant was arrested about 50 yards from his parents' house as he "was coming from a wooded area" in back of it.

The shoes defendant was wearing when arrested were taken by the sheriff and other shoes were obtained for defendant. Defendant's shoes were identified and offered in evidence. Plaster of paris casts made of the tracks the officers had followed were identified and offered in evidence.

On 22 June 1972, after he had been advised of his constitutional rights and had signed a waiver, defendant stated that he had not been to Mrs. Rominger's house on 21 June 1972 and had never been to her house; that he did not know her; and that he had not raped or robbed her. Defendant further stated that, during the afternoon of 21 June 1972, when walking on Highway No. 701, he got scared when he saw police cars and heard the sirens; and that he ran into the woods, slept there and stayed until the occasion of his arrest.

On 26 June 1972 defendant's shoes and the plaster of paris casts were taken to the Identification Division of the State Bureau of Investigation at Raleigh, N. C. Steven Randolph Jones, the supervisor of the Identification Division, who was found by the court upon ample evidence to be an expert in footprint comparison and identification, examined and compared the shoes and the numerous plaster of paris casts. Based thereupon, he reached and expressed the opinion that the footprints lifted by the plaster of paris casts were made by these shoes.

Thereafter, on 26 June 1972, about 7:30 p.m., S.B.I. Agent Hunt talked with defendant again. He was again advised of his constitutional rights and defendant signed a waiver. Defendant stated at that time that he had known Mrs. Rominger for many years; that he had often been to her house; and that he went to her house on the afternoon of 21 June 1972. He further stated that he left his home at approximately 2:30 p.m. and as "always" he used the back way to go to her house. When he knocked on the back door, Mrs. Rominger invited him in "as usual." He further stated that after they had talked in the kitchen and in the den they went into the bedroom where he had sexual intercourse with her with her consent. He further stated that this was the first time that he had had sexual relations with her. He further stated that he did not tie her in any manner; that he had never seen the pieces of rope offered in evidence; that he knew nothing of burns or marks on Mrs. Rominger's wrists; that he knew nothing of a brick in Mrs. Rominger's living room; and that he did not at any time wear a mask when he was in Mrs. Rominger's house. He further stated that he became frightened when he saw the sheriff's cars on the highway and heard the sirens; and that he went into the woods and stayed there until the time of his arrest.

Deputy Sheriff Ray Moore testified that he had known Mrs. Rominger around fifteen years, having lived in the same community where she lived during most of that period, and that her general reputation in the community was good.

The State offered in evidence the pieces of rope and the brick which had been identified and also photographs of the bedroom made when the officers were there, the photographs being offered to illustrate and explain the testimony of the witnesses who testified concerning what they found in the bedroom.

With specific reference to the armed robbery charge: Mrs. Rominger testified that her purse contained a billfold in which

she was keeping two ten dollar bills and also a five dollar bill; that the purse also contained a one dollar bill and "a little bit of change"; that after defendant left and after the officers arrived she looked in her purse and found the one dollar bill and the change but the bills were "gone from [her] billfold." No fingerprints suitable for identification were found on the purse. At the time of his arrest, defendant was searched. He had a dime, three pennies and an empty billfold.

Evidence offered by defendant consisted of his own testimony and the testimony of his parents. The testimony of defendant's parents tends to show they lived on Highway 701, about a half mile from where Mrs. Rominger lived; that, when going from their house to Clinton, they passed Mrs. Rominger's house; that they had known Mrs. Rominger and her husband for twelve or fourteen years; that their contacts had been infrequent; and that they had not visited in the homes of one another. They testified that defendant had been away from home for a number of years but had returned in December of 1971.

Defendant testified that he was twenty-six years old; that he went to his parents' home on Christmas, 1971, having been paroled in Maryland on 21 December 1971; and that from 1961, when he stole his father's car, until his parole in Maryland in December 1971, he had been convicted and from time to time had served sentences both in North Carolina and in Maryland for various criminal offenses.

Defendant testified that he had been "having an affair with [Mrs. Rominger] for the last nine or ten years"; that he had visited her house fifteen or twenty times, including three or four times since Christmas 1971; that he had had sexual intercourse with her "seven or eight times" before 21 June 1972; that she was the first woman with whom he had sexual relations and this occurred when he was 16 or 17 years old; that when visiting her he always used the back door; that on 21 June 1972, Mrs. Rominger let him in when he went to the back door and knocked; that there were two dogs on the back porch who knew him and so did not bark; that he and Mrs. Rominger talked in the kitchen and then in the den; and that, at Mrs. Rominger's suggestion, they went into the bedroom and had sexual intercourse. He further testified that he did not leave until half an hour after they had had sexual intercourse; that he told Mrs. Rominger that he was not going to come up to see her anymore;

that they argued about the matter; and that, when he started out the door, she told him that she was going to have him "locked up for rape." He further testified that when she made this remark he just laughed at her and went on out the back door, but that when he saw the sheriff's cars and heard the sirens he became frightened because he feared Mrs. Rominger had carried out her threat. Apart from the foregoing, his testimony at trial was substantially in accord with statements he had made to S.B.I. Agent Hunt on 26 June 1972 with this exception: He testified he told Hunt that his sexual intercourse with Mrs. Rominger on 21 June 1972 was the first time he had had sexual intercourse with her *since he came back on Christmas 1971.*

With reference to the armed robbery indictment, the jury returned a verdict of not guilty.

With reference to the rape indictment, the jury returned a verdict of guilty of rape. Upon this verdict, the court pronounced judgment that defendant "be confined in the State prison for the rest of his natural life."

Defendant excepted and appealed.

*Attorney General Robert Morgan and Assistant Attorney General William F. Briley for the State.*

*David J. Turlington, Jr., for defendant appellant.*

BOBBITT, Chief Justice.

Defendant's assignments of error relate solely to the court's refusal to grant his motions for judgment to dismiss as in case of nonsuit. G.S. 1-173. Defendant having offered evidence, the only question is whether the court erred in denying the motion made at the close of all the evidence. *State v. Meadows,* 272 N.C. 327, 333, 158 S.E. 2d 638, 642 (1968).

The evidence set forth in our preliminary statement shows clearly its sufficiency to withstand defendant's motion and to support the verdict of guilty of rape. Mrs. Rominger's testimony as to what occurred in respect of rape was unequivocal, explicit and corroborative. Her testimony with reference to the identity of her assailant was strongly supported by circumstantial evidence developed by the prompt, diligent and skillful work of the officers. Moreover, all doubt as to the identity of her assail-

ant was completely removed by defendant's *second* statement to the officers and by defendant's testimony that he was the person who had sexual intercourse with Mrs. Rominger in her home on 21 June 1972.

There is no substance in the contention that the verdict in the rape case is in conflict with the verdict in the armed robbery case. Assuming, *arguendo,* that the evidence was sufficient to warrant submission of the armed robbery charge to the jury, the probative force of the evidence with reference to the robbery indictment was minuscule as compared with the probative force of the evidence supporting the indictment for rape.

Upon being polled, each juror stated that his verdict was guilty of rape and that he still assented thereto.

Defendant having failed to show error, the verdict and judgment will not be disturbed.

No error.