NO. COA13-1284

NORTH CAROLINA COURT OF APPEALS

Filed: 3 June 2014

STATE OF NORTH CAROLINA

  v.          Johnston County
               No. 12CRS055655
FRANCIS MARIUS HOGAN, JR.,
  Defendant.


Appeal by defendant from Judgment entered 12 March 2013 and Order entered 26 February 2013 by Judge Thomas H. Lock in Superior Court, Johnston County. Heard in the Court of Appeals 20 March 2014.


> *Attorney General Roy A. Cooper III, by Special Deputy Attorney General Lars F. Nance, for the State.*
>
> *Michele Goldman, for defendant-appellant.*


STROUD, Judge.

Francis Hogan, Jr. ("defendant") appeals from the judgment entered 12 March 2013 after he pled guilty to assault by strangulation and from the order entered 26 February 2013 denying in part his motion to suppress statements he made to police. We affirm the trial court's order denying defendant's motion to suppress in part and find no error in sentencing.

I. Background

Defendant was indicted for assault on a female and assault by strangulation on 3 December 2012. The indictments alleged that defendant had assaulted Karen Teixeira by pushing her against a wall and by putting his hands around her neck and choking her. Defendant moved to suppress statements he made to police when they responded to the home that he and Ms. Teixeira shared.

On 16 September 2012, Deputy Reliford and Deputy Carroll of the Johnston County Sheriff's Office responded to a call reporting a domestic disturbance at a residence in Princeton. After they entered the house, they found defendant hiding in a closet which also contained "an engine and various engine parts" and the deputies were concerned that these objects may contain a hidden weapon. When defendant came out of the closet, Deputy Reliford put handcuffs on him and explained that he was doing this for "officer safety reasons." Defendant began acting "aggressively" toward Ms. Teixeira and her son and "telling them that he was going to have them removed from the home." Deputy Reliford walked defendant out to the back deck to help him calm down and to be able to talk to him "outside the presence of defendant's girlfriend, the victim." While they were on the back deck, Deputy Carroll left to respond to another call, thus

leaving Deputy Reliford alone with defendant, the victim, and her son. On the back deck, Deputy Reliford began asking defendant questions about what had happened. Deputy Reliford did not advise defendant of his *Miranda* rights. Defendant made incriminating statements in response to Deputy Reliford's questions.

Deputy Reliford then asked Ms. Teixeira to come out to the back porch. He observed bruising on her neck and asked how she got the bruises. She stated that defendant put his hand around her neck and picked her up. She also stated that he had pushed her into a wall. Defendant then interjected that he put his hand around Ms. Teixeira's neck and squeezed and that he had pushed her into a wall. Deputy Reliford then placed defendant under arrest.

The trial court granted the motion in part and denied it in part. It concluded that defendant was in custody during his interactions with Deputy Reliford. It therefore suppressed the statements defendant made in response to Deputy Reliford's direct questions. However, it concluded that defendant's second statement was "spontaneous," and not made in response to any questions posed to him by Deputy Reliford. It further concluded that asking Ms. Teixeira what happened in front of defendant was

not the functional equivalent of interrogation. Therefore, the trial court denied defendant's motion to suppress those statements. It entered a written order finding the facts as summarized above on 26 February 2013.

Defendant entered an *Alford* guilty plea to assault by strangulation on 6 March 2013, but specifically reserved his right to appeal the partial denial of his motion to suppress. The State dismissed the assault on a female charge. On 12 March 2013, the trial court entered judgment sentencing defendant to a mitigated term of 9-20 months imprisonment, suspended for 30 months of supervised probation. That same day, defendant filed written notice of appeal from both the judgment and the order denying his motion to suppress in part.

## II. Motion to Suppress

Defendant argues that the trial court erred in denying his motion to suppress his second statement to police because he was subjected to custodial interrogation without the benefit of *Miranda* warnings. He further contends that several of the trial court's findings of fact are unsupported by competent evidence.

A. Standard of Review

> It is well-established that the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact are conclusive on

> appeal if supported by competent evidence, even if the evidence is conflicting. . . . [However,] the trial court's determination of whether an interrogation is conducted while a person is in custody . . . involves reaching a conclusion of law, which is fully reviewable on appeal.

*State v. Crudup*, 157 N.C. App. 657, 659, 580 S.E.2d 21, 23 (2003) (citations, quotation marks, and brackets omitted). Thus, we must first determine whether there is competent evidence to support the challenged findings of fact. We will then review *de novo* the trial court's conclusion of law as to whether defendant was subject to custodial interrogation. *See State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) ("Conclusions of law are reviewed de novo and are subject to full review. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal."(citations and quotation marks omitted)).

B. Findings of Fact

We first address defendant's challenge to the findings of fact. The trial court found that:

> 1. The defendant is charged with Assault on a Female and Assault by Strangulation.
>
> 2. On September 16, 2012, Deputy R.L. Reliford of the Johnston County Sheriff's Office responded to a domestic disturbance at [a residence] in Princeton.

3. The residence was the home of defendant and Karen Tiexeira [sic].

4. Upon entering the home, Deputies Paige Carroll and Reliford found defendant hiding in a closet and detained the defendant by putting him in handcuffs when he came out of the closet.

5. The closet in which defendant was hiding contained an engine and various engine parts. The deputies were concerned these objects may have contained a hidden weapon.

6. As the defendant stepped out of the closet, Deputy Reliford informed the defendant to put his hands up and then placed him in handcuffs. Deputy Reliford testified that he told the defendant that he was doing this for officer safety reasons.

7. During the time the defendant had been handcuffed, the defendant was acting aggressively toward his girlfriend and her son by telling them he was going to have them removed from the home.

8. In an effort to calm the defendant down, Deputy Reliford walked the defendant to the back deck to sit down so that he could speak with him about the incident outside the presence of the defendant's girlfriend, the victim.

9. At this time, Deputy Carroll left the residence in order to respond to another call.

10. After sitting down on the back deck, the defendant made incriminating statements regarding the domestic disturbance to Deputy Reliford in response to questioning by

Deputy Reliford. Prior to this point, Deputy Reliford had not Mirandized the defendant.

11. Deputy Reliford asked the victim, Karen Tiexara [sic], to come out to the back deck where he observed red marks, swelling and bruising around her neck.

12. Deputy Reliford asked the victim how she got the marks on her neck and she responded by saying that Francis [defendant] put his hand around her neck several times and picked her up while he had his hand around her neck.

13. The victim also stated that the defendant had pushed her into a wall.

14. The defendant then spontaneously stated that he put his hand around . . . [his girlfriend's] neck and squeezed and that he pushed her into the wall.

15. Neither the victim nor Deputy Reliford were speaking to the defendant when he spontaneously uttered this statement.

16. Deputy Reliford then placed the defendant under arrest for Assault on a Female and Assault by Strangulation.

Defendant contends that finding 9 is unsupported by competent evidence because there was no evidence that Deputy Carroll left before defendant's girlfriend was asked to step outside. He also argues that findings 14 and 15 contain conclusions of law in that they characterize his statement as spontaneous. Deputy Carroll testified at the suppression hearing that she remained in the house a short time after defendant had

been brought outside before receiving another call and leaving. Deputy Reliford testified that he brought defendant out to the back deck to speak with him and that after speaking about what happened, he opened the door and asked Deputy Carroll to send Ms. Teixeira out. Although the testimony of the officers was somewhat contradictory as to the timing of when Deputy Carroll left, it was proper for the trial court to resolve these evidentiary conflicts. *State v. Jones*, 161 N.C. App. 615, 623, 589 S.E.2d 374, 378 (2003) ("It is the trial court's duty to resolve any conflicts and contradictions that may exist in the evidence." (citation and quotation mark omitted)), *app. dismissed and disc. rev. denied*, 358 N.C. 379, 597 S.E.2d 770 (2004). Moreover, the exact timing of when Deputy Carroll left is not material to the legal issues. It is clear that Deputy Carroll left the residence while Deputy Reliford was still trying to investigate what had happened, leaving just one officer with the responsibility of dealing with both defendant and Ms. Teixeira.[1]

Defendant also contends that the trial court's

---

[1] Deputy Carroll also testified that normally two officers responded to calls for domestic disturbances for officer safety reasons. Deputy Reliford explained that he had previously "taken someone into custody and actually had to fight the other party. So they can get dangerous."

characterization of his statements as "spontaneous" were actually conclusions of law, not findings of fact. We agree. The issue of whether defendant's statements were spontaneous or in response to police interrogation is the central legal issue in question, as discussed below. *See State v. Hipps*, 348 N.C. 377, 395, 501 S.E.2d 625, 636 (1998), *cert. denied*, 525 U.S. 1180, 143 L.Ed. 2d 114 (1999). Therefore, we will consider all of the trial court's findings regarding the spontaneity of defendant's statements as conclusions of law.

C.   Interrogation or Its Functional Equivalent

Next, we must determine whether the trial court correctly concluded that the questioning of defendant's girlfriend in his presence did not constitute the functional equivalent of questioning and that defendant's statements were spontaneous.

"The *Miranda* warnings and waiver of counsel are required only when an individual is being subjected to custodial interrogation. 'Custodial interrogation' means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Kincaid*, 147 N.C. App. 94, 101, 555 S.E.2d 294, 300 (2001) (citation and quotation marks omitted).

The trial court concluded that defendant was in custody during the entirety of his interactions with police. This determination has not been challenged by either party. The trial court concluded, however, that his statements to police after his girlfriend was brought outside were not in response to police interrogation. Specifically, the trial court concluded that defendant's statements were spontaneous and not in response to police questioning or its functional equivalent.

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part

> of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02, 64 L.Ed. 2d 297, 307-08 (1980) (footnotes omitted). "Volunteered statements of any kind are not barred by the Fifth Amendment." *State v. James*, 215 N.C. App. 588, 593, 715 S.E.2d 884, 888 (2011) (citation, quotation marks, and brackets omitted).

Defendant argues that asking his girlfriend what happened in front of him is akin to the coercive techniques discussed in *Innis* and *Miranda*.

> The questioned practices [in *Miranda*] included the use of lineups in which a coached witness would pick the defendant as the perpetrator, the so-called 'reverse line-up' in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, and a variety of psychological ploys, such as to posit the guilt of the subject, to minimize the moral seriousness of the offense, and to cast blame on the victim or on society.

*Arizona v. Mauro*, 481 U.S. 520, 526, 95 L.Ed. 2d 458, 466 (1987) (citations, quotation marks, ellipses, and brackets omitted). The *Miranda* court was concerned with the coercive nature of these practices. *In re D.A.C.*, ___ N.C. App. ___, ___, 741 S.E.2d 378, 383 (2013) (noting that "the sole concern of the

Fifth Amendment, on which *Miranda* was based, is governmental coercion" (citation, quotation marks, and brackets omitted)).

Deputy Reliford's questioning of defendant's girlfriend was entirely unlike the coercive interrogation with which *Miranda* and its progeny are concerned. *See State v. Meadows*, 272 N.C. 327, 337, 158 S.E.2d 638, 644-45 (1968) ("The four cases decided by *Miranda* shared salient features, among which was incommunicado interrogation of individuals in a police-dominated atmosphere." (citation and quotation marks omitted)). The deputy was investigating an ongoing situation, attempting to figure out whether a crime was even committed. He asked defendant's girlfriend how she got the marks on her neck. She had not already incriminated defendant. The deputy could not have known what her response could be—she could have inculpated or exculpated defendant. In addition, since Deputy Carroll had to leave to respond to another call, only one officer was left to deal with both defendant and the victim. Although this case is a close one, we conclude that the deputy's question to Ms. Teixeira "did not constitute the functional equivalent of questioning because the officer's [question] did not call for a response from defendant and therefore cannot be deemed as reasonably likely to elicit an incriminating response from

defendant." *State v. Gantt*, 161 N.C. App. 265, 269, 588 S.E.2d 893, 896 (2003), *disc. rev. denied*, 358 N.C. 157, 593 S.E.2d 83 (2004); *see also*, *Meadows*, 272 N.C. at 337, 158 S.E.2d at 645 ("A general investigation by police officers, when called to the scene of a shooting, automobile collision, or other occurrence calling for police investigation, including the questioning of those present, is a far cry from the 'in-custody interrogation' condemned in *Miranda*.").

This case is distinguishable from *State v. Fuller*, 270 N.C. 710, 155 S.E.2d 286 (1967), cited by defendant. In *Fuller*, the police were interviewing the witness to an assault in the presence of the defendant. *Fuller*, 270 N.C. at 713, 155 S.E.2d at 288. The officers warned defendant that anything he said *or did not say* in response to the witness' statement could be used against him. *Id.* at 713-14, 155 S.E.2d at 288. The witness said that the defendant had used a baseball bat to assault the victim. *Id.* at 713, 155 S.E.2d at 288. The officers then asked the defendant if he had anything to say in response. *Id.* The defendant stated, "Yes, I hit the man, but I did not think I hit him that hard." *Id.* The Supreme Court held that the statement was inadmissible because the police had incorrectly informed him

that his silence could be used against him. *Id.* at 715, 155 S.E.2d at 289. The Court explained,

> To make a prisoner listen to an accuser with the admonition that if he talks or doesn't talk—to be damned if he does, and to be damned if he doesn't—is to put him in an impossible position. It violates the rights of the captive audience, which constitutes reversible error.

*Id.*

This case is distinguishable from *Fuller* in two important respects. First, and perhaps most importantly, the police in *Fuller* directly asked the defendant to respond to the witness' statement. Here, by contrast, Deputy Reliford did not ask defendant to say anything in response to Ms. Teixeira's statement. Second, the officers in *Fuller* warned the defendant that any response *or his silence* could be used against him, which "put him in an impossible position." *Id.* There was no such improper warning here. Therefore, we conclude that *Fuller* does not require suppression of defendant's statement.

For the foregoing reasons, we hold that the trial court correctly concluded that defendant's statements in response to those of Ms. Teixiera were spontaneous and not the result of custodial interrogation. The deputy's question of Ms. Teixiera was not the functional equivalent of questioning defendant.

Therefore, we affirm the trial court's order denying defendant's motion to suppress these statements.

### III. Sentencing

Defendant next argues that the trial court erred in calculating his prior record level because it counted a New Jersey theft conviction as a Class I felony when it is not considered a felony under New Jersey law, and, in any event, should have been classified as a misdemeanor because it is substantially similar to a North Carolina misdemeanor.

Defendant was convicted on 9 February 1995 of fourth degree theft in Morris County, New Jersey. On 21 April 1995, he was convicted of third degree theft and fourth degree theft, also in Morris County, New Jersey. The trial court found that the 9 February 1995 conviction was substantially similar to misdemeanor theft in North Carolina and classified it as a Class 1 misdemeanor. The trial court found that the third degree theft conviction, by contrast, was a felony in New Jersey and classified it as a Class I felony.

Defendant argues that because New Jersey does not use the term "felony" to classify its offenses, the trial court could not properly determine that third degree theft is a felony for sentencing purposes. It is true that the New Jersey criminal

code does not use the term "felony." *State v. Smith*, 181 A.2d 761, 767 (N.J. 1962), *cert. denied*, 374 U.S. 835, 10 L.Ed. 2d 1055 (1963). Instead, all crimes are classified as a crime of the first, second, third, or fourth degree. N.J. Stat. Ann. § 2C:43-1 (2011). Other, more minor offenses are classified as "disorderly person offense[s]." *See* N.J. Stat. Ann. § 2C:43-8 (2011). Theft may be classified as a second, third, or fourth degree offense, or as a disorderly person offense, depending on the nature of the crime and the value of the property taken. N.J. Stat. Ann. § 2C:20-2 (2011). Defendant was convicted of a third degree theft offense.

Under New Jersey law, a court may sentence a defendant convicted of a third degree offense to a specific term of imprisonment between three and five years. N.J. Stat. Ann. § 2C:43-6 (2011). A crime of the fourth degree is punishable by up to 18 months imprisonment. *Id.* The New Jersey Supreme Court has held that crimes "punishable by imprisonment for more than a year in state prison" are comparable to common law felonies. *State v. Doyle*, 200 A.2d 606, 614 (N.J. 1964). New Jersey courts have clearly recognized that their third-degree crimes are felonies by a different name. *See United States v. Brown*, 937 F.2d 68, 70 (2d Cir. 1991) ("[U]nder New Jersey law, offenses

punishable by more than one year in prison constitute common-law felonies."); *Kaplowitz v. State Farm Mut. Auto Ins. Co.*, 493 A.2d 637, 640 (N.J. Super. Ct. Law Div. 1985) ("[O]ffenses that are punishable by more than one year in state prison should be treated as common law felonies.").

We recognize that there are several cases in which this Court has decided that New Jersey convictions cannot count as "felonies" for the purpose of habitual felon charges. *See, e.g.*, *State v. Lindsey*, 118 N.C. App. 549, 455 S.E.2d 909 (1995), *State v. Carpenter*, 155 N.C. App. 35, 573 S.E.2d 668 (2002), *disc. rev. dismissed and cert. denied*, 356 N.C. 681, 577 S.E.2d 896 (2003), and *State v. Moncree*, 188 N.C. App. 221, 655 S.E.2d 464 (2008). None of these cases analyzes the meaning of "misdemeanor" or "high misdemeanor" under New Jersey law.[2] They simply conclude that because the crimes were not "certified" as felonies under New Jersey law or called "felonies" they could not be considered felonies for purposes of the habitual felon

---

[2] New Jersey used to classify some serious crimes as misdemeanors or "high misdemeanors." *See, e.g.*, *State v. Sisler*, 827 A.2d 274, 276 (N.J. 2003) (noting that production of child pornography was classified as a "high misdemeanor"). Under the modern statutes, a "high misdemeanor" is equivalent to a crime of the third degree for sentencing, and to a crime of the first, second, or third degree for other purposes. N.J. Stat. Ann. § 2C:43-1(b); N.J. Stat. Ann. § 2C:1-4 (2011). A "misdemeanor" is equivalent to a crime of the fourth degree for sentencing. N.J. Stat. Ann. § 2C:43-1(a).

statute. Applied to the sentencing context, the rule in these cases would suggest that the State can never use a New Jersey conviction to establish prior record points without proving that the offense is substantially similar to a North Carolina offense. There is no suggestion in the sentencing statutes that the Legislature intended to single out New Jersey convictions for such unfavorable treatment.

Even if we were to assume that we must apply these cases to N.C. Gen. Stat. § 15A-1340.14, this case is distinguishable in that the State presented a "certification" that third degree theft is considered a felony in New Jersey. In *Lindsey*, the first case in which we suggested that a New Jersey offense could not be considered a felony because it was not labeled as such, we hinted that the State could nevertheless show it was a felony by providing certification from some official that it was a felony. *Lindsey*, 118 N.C. App. at 553, 455 S.E.2d at 912.

Here, the State introduced a criminal history record from the "NLETS" system, containing defendant's "New Jersey Criminal History Detailed Record" (original in all caps). The printout contained a statement that "This record is certified as a true copy of the criminal history record information on file for the assigned state identification number" (original in all caps).

The record listed defendant's theft convictions as "felony conviction[s]" (original in all caps). Therefore, even if the fact that New Jersey considers third degree offenses to be the same as common law felonies is alone insufficient, we hold that this certification is sufficient under *Lindsey*. Moreover, given our review of New Jersey law above, this certification appears to accurately reflect the law as understood by the courts of that state.

Finally, defendant contends that even if third degree theft is a felony in New Jersey, it is substantially similar to misdemeanor larceny in North Carolina and the trial court erred in failing to classify it as a misdemeanor. We disagree.

The principal error in defendant's argument is that he confuses what he is required to show to prove that an out-of-state felony is substantially similar to a North Carolina misdemeanor. Under N.C. Gen. Stat. § 15A-1340.14(e), if the State establishes that the defendant has an out-of-state felony conviction, it is by default considered a Class I felony, regardless of whether it is substantially similar to a North Carolina felony. *State v. Hinton*, 196 N.C. App. 750, 755, 675 S.E.2d 672, 675 (2009). The State is not required to show any substantial similarity in that context. *Id.* However, the

defendant may still show that the out-of-state felony is substantially similar to a North Carolina misdemeanor. N.C. Gen. Stat. § 15A-1340.14(e). The defendant bears the burden of showing substantial similarity in that case. *State v. Crawford*, ___ N.C. App. ___, ___, 737 S.E.2d 768, 770, *disc. rev. denied*, ___ N.C. ___, 743 S.E.2d 196 (2013).

Here, defendant failed to show that third degree theft in New Jersey is substantially similar to a North Carolina misdemeanor. Essentially, he argues that because third degree theft is not substantially similar to felony larceny in North Carolina, it must be substantially similar to misdemeanor larceny. But that analysis flips the burden of proof. It is defendant who must show that third degree theft is substantially similar to misdemeanor larceny; the State is not required to show that it is more similar to felony larceny than misdemeanor larceny.

New Jersey defines "theft" as the "involuntary transfer of property; the actor appropriates property of the victim without his consent or with consent obtained by fraud or coercion." *State v. Talley*, 466 A.2d 78, 81 (N.J. 1983) (citation and quotation marks omitted). A person is guilty of third degree theft in New Jersey if

(a)  The amount involved exceeds $500.00 but is less than $75,000.00;

(b)  The property stolen is a firearm, motor vehicle, vessel, boat, horse, domestic companion animal or airplane;

(c)  The property stolen is a controlled dangerous substance or controlled substance analog as defined in N.J.S.2C:35-2 and the amount involved is less than $75,000.00 or is undetermined and the quantity is one kilogram or less;

(d)  It is from the person of the victim;

(e)  It is in breach of an obligation by a person in his capacity as a fiduciary and the amount involved is less than $50,000.00;

(f)  It is by threat not amounting to extortion;

(g)  It is of a public record, writing or instrument kept, filed or deposited according to law with or in the keeping of any public office or public servant;

(h)  The property stolen is a person's benefits under federal or State law, or from any other source, which the Department of Human Services or an agency acting on its behalf has budgeted for the person's health care and the amount involved is less than $75,000.00;

(i)  The property stolen is any real or personal property related to, necessary for, or derived from research, regardless of value, including, but not limited to, any sample, specimens and components thereof, research subject, including any warm-blooded or cold-blooded animals being used for research or intended for use in research,

supplies, records, data or test results, prototypes or equipment, as well as any proprietary information or other type of information related to research;

(j) The property stolen is a New Jersey Prescription Blank as referred to in R.S.45:14-14;

(k) The property stolen consists of an access device or a defaced access device; or

(l) The property stolen consists of anhydrous ammonia and the actor intends it to be used to manufacture methamphetamine.

N.J. Stat. Ann. § 2C:20-2(3).

In North Carolina, a person commits misdemeanor larceny if he takes and carries away the property of another valued less than $1,000 with the intent to permanently deprive the rightful owner of it, unless one of the circumstances in N.C. Gen. Stat. § 14-72(b) applies, in which case it is a felony regardless of value. N.C. Gen. Stat. § 14-72 (2013); *State v. Sheppard*, ___ N.C. App. ___, ___, 744 S.E.2d 149, 151 (2013). Some of the circumstances of felony larceny are the same both in North Carolina and New Jersey. For instance, in both states, larceny from the person and larceny of a firearm constitute a more serious offense, regardless of value. *See* N.C. Gen. Stat. § 14-72(b)(1), (4); N.J. Stat. Ann. § 2C:20-2 (b)(2)(b), (d). As defendant correctly points out, there are many more ways to

commit third degree theft in New Jersey than felony larceny in North Carolina. Yet, that is not the relevant question. Defendant was required to prove that third degree theft is substantially similar to misdemeanor larceny, not that it is dissimilar from felony larceny. Given the disparity in elements between our definition of misdemeanor larceny and New Jersey's definition of third degree theft, defendant cannot show that they are substantially similar.

We hold that the trial court did not err in concluding that third degree theft is not substantially similar to misdemeanor larceny. There are many elements of third degree theft not found in misdemeanor larceny. Several of these possible elements, such as theft from a person, would also make the larceny a felony in North Carolina. Therefore, the New Jersey crime of third degree theft is not substantially similar to North Carolina's misdemeanor larceny. In sum, there was no error in defendant's sentencing.

## IV. Conclusion

For the foregoing reasons, we affirm the trial court's order denying defendant's motion to suppress in part and find no error in sentencing.

AFFIRMED; NO ERROR.

Judges HUNTER, JR., Robert N. and DILLON concur.