THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOSEPH GLOVER and JOE WILLIAMS, Defendants.

Supreme Court, Trial Term, Bronx County, December 21, 1966.

521

*Isidore Dollinger, District Attorney* (*Thomas O'Malley* of counsel), for plaintiff. *Mary Johnson Lowe* for defendants.

THOMAS C. CHIMERA, J. One, Blakely, was arrested in an apartment opening from the landing at a point nearest the top of the stairway leading up from the street floor of premises No. 879 Kelly Street, Bronx, New York City.

Defendants make a big point of the fact that the complaint designates this apartment as Apt. No. 1, while in fact the number of the apartment described by the police witness should be 4. I am convinced from the evidence that the designation in the complaint was an honest error and of little consequence to this opinion which must turn on the credibility of the witnesses and upon consideration of the law applicable to the facts found by me.

The testimony of the police officer was worthy of belief in every respect.

Blakely was arrested for two alleged illegal sales of cannabis (marijuana), earlier made by him to a police undercover agent. The first alleged sale was made on the sidewalk in front of the building above described — the second, in the apartment in question.

On this " admissibility " hearing generated by defendants Williams and Glover, an analysis of the police activity surrounding Blakely's arrest is of critical importance although Blakely himself is not a party to the application.

As a preliminary, I am of the opinion that the arrest of Blakely was made on " probable cause " in an apartment which the police reasonably suspected was Blakely's base for illegal narcotics' trade and that the police fully intended to search the apartment in question upon the arrest of Blakely. And rightly so.

Blakely's connection with the apartment extends beyond his mere presence there. He is alleged to have made one of the illegal sales there and he was the one who opened the door to the police on the occasion of his arrest. This last act of familiarity and control in itself was sufficient, in my opinion, to justify the police in searching the apartment for contraband as an incident to Blakely's arrest therein. It makes no difference whether the police had enough time to obtain a warrant for the specific purpose. " The right ' to search the place where the arrest is made * * * ' seems to have stemmed not only from the acknowledged authority to search the person, but also from the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest * * *. It became accepted that the premises where the arrest was made * * * were subject to search without a warrant. Such a

search was not ' unreasonable ' " (*United States* v. *Rabinowitz,* 339 U. S. 56, 61).

Nor does the fact that the police had to reach into closed chest drawers in one of the bedrooms render the police search otherwise unreasonable. Narcotics are not likely to be strewn carelessly about in open view.

At the time of Blakely's arrest and before the police search that followed, defendant Williams was also in the apartment. He was first detained and questioned by the police and later also arrested.

This record presents to the court another multifaceted problem of constitutional dimensions, involving as it does the Fourteenth Amendment to the Federal Constitution, which, it is settled, secures against State invasion the same privileges that the Fourth, Fifth and Sixth Amendments guarantee against Federal infringement (*Mapp* v. *Ohio,* 367 U. S. 643; *Escobedo* v. *Illinois,* 378 U. S. 478; *Malloy* v. *Hogan,* 378 U. S. 1; *Miranda* v. *Arizona,* 384 U. S. 436; *Schmerber* v. *California,* 384 U. S. 757).

My first problem is to determine whether there was " custodial interrogation " within the meaning of *Miranda* (*supra*). " By custodial interrogation we mean questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way " (*Miranda,* p. 444; emphasis supplied).

This pronouncement seems to say that the fact of " custody " *alone* is sufficient to invoke the mandated warnings. The difficulty with this conclusion, however, is that in the absence of avowed intention (more often than not), a finding of " custody " depends on the subjective intention of the police officers. This in turn depends at times on how much knowledge the police possess (not always reflected on the record) and, at others, on whether the course of police interrogation appears to be routine investigation or questioning aimed at eliciting a confession or admission.

Among other things, the police witness testified as follows:

A. I questioned Harold Blakely whether he lived in this apartment  *  *  *. He said, no, he lived up the street some place. I questioned the defendant Williams if he lived in this apartment. He said he did. I asked him if there was any contraband or marijuana in the apartment. He says he didn't know anything at this time. I made a search in this apartment in the room; in the bedroom I found three yellow envelopes in the top dresser, in the top dresser that was located in this particular bedroom.

I questioned Williams as to who occupied that room. He said he and one named Joe Glover. I asked him where Joe Glover was. He said he was at his aunt's house across the street. I asked him as to the marijuana. He said it was his property.

I says, "Do you use marijuana?" He said, "No." I said, "Well, what do you do with this marijuana?"

MRS. LOWE: Who is the "he" you are referring to, sir. Excuse me.

THE COURT: Williams?

THE WITNESS: Williams.

A. I said, "What do you do with this marijuana?" He said, "I sell five dollar bags of marijuana." I says, "Only yourself or does any of this belong to Mr. Glover?" He said, "Me and Glover are partners." At which time I took him over to find Glover, entered the building across the street, and Glover was coming down the stairs.

Williams said to me "This is Joe Glover." I asked Glover, "Is your name Glover?" He said, to me, "Yes."

Q. Do you see that person in the court today? A. Yes, sir, I do.

Q. Point him out. A. The fellow with the black sport shirt.

MR. O'MALLEY: May the record indicate the officer just pointed out the defendant Glover sitting at the counsel table.

Q. Continue. A. I asked Glover if he lives with Williams across the street. He said, "Yes, I do." At which time, I said, "Well, will you accompany me across the street?" He did. In the apartment, I questioned him as to the yellow envelopes. I says, "Any of these here yours?" He said, "Yes." I said, "Do you use marijuana?" He said, "Yes, I do. I smoke marijuana." I says, "Well, what do you do with these yellow envelopes?" He says, "I sell them for five dollars apiece, and I also sell cigarets for five — seventy-five cents."

Q. What happened after that, Officer? A. I placed them under arrest and took them to the 41st Precinct station house.

MR. O'MALLEY: Miss Lowe, will you stipulate for the purpose of the hearing that we need not produce the three envelopes and that there was a laboratory test made of the contents of the envelopes by Mary Gilbert, a police chemist, and the report does indicate, the laboratory report shoes [sic] that cannabis was found to be present in each of the envelopes in the quantity of one-quarter ounce plus 15 grains.

MRS. LOWE: For the purpose of the hearing, I so concede."

" Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo* v. *Illinois*, 378 U. S. 478, 492. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (*Miranda, supra*, pp. 477–478.)

*Miranda* does not proscribe police inquiry or, for that matter, custodial interrogation as such. It merely commands the authorities to warn a person in " custody " of his constitutional rights

before interrogating him. Moreover, whatever else *Miranda* may have intended "custody" to mean, this much is apparent — police questioning of a person wherever detained, upon whom suspicion has already focused, appears ruled to be "custodial interrogation". And, assuming a detention anywhere of a person not under suspicion but upon whom suspicion focuses later during the course of a police inquiry, then, from that point on, all subsequent questioning appears ruled also to be "custodial interrogation".

There is no evidence in this record that the police knew of Williams or suspected at least that he was a resident of the apartment in question. For all they knew, he might have been an innocent visitor. Until he stated that he lived there, no probable cause was discernible and no possible suspicion could have focused upon Williams from which one could spell out a subjective police intent to interfere with his freedom of action in any significant way.

It could be argued with some persuasion that as soon as Williams said he lived in the apartment in question, Williams' Fifth and Sixth Amendment rights came into sharp relief and the police could not proceed further with their interrogation of Williams without first giving him the warnings mandated by *Miranda*. From their very nature and effect, it cannot be denied that all subsequent questions put to Williams were designed to elicit confession or admission from him. But *Miranda* cannot be tortured to "throw back" to his first fateful answer so as to bring that first answer within the ambit of "custodial interrogation" as defined in *Miranda*. *Nothing in Miranda suggests that it does!*

On the entire record, I find as facts:

1. That up to and including Williams' first answer, to the effect that he resided in the apartment in question, there was no probable cause for his arrest and no police suspicion had focused upon Williams sufficient to establish a manifest or subjective police intent to deprive Williams of his freedom of action in any significant way (cf. *People* v. *Reason*, 52 Misc 2d 425).

2. That up to and including Williams' first answer to the effect that he resided in the apartment in question, the interrogation of Williams was in the nature of general on-the-scene questioning as to facts surrounding the arrest of Blakely; that the first police inquiry of Williams having for its obvious purpose the eliciting of an explanation for the latter's presence in the apartment was a proper exercise of traditional police

investigative procedures, and Williams' answer, to the effect that he resided in the apartment in question, was elicited without compulsive influence on the part of the police.

On the foregoing facts, there is no question in my mind that after his first fateful answer, suspicion of complicity with Blakely focused sufficiently upon Williams to convert what started out as a permissible general inquiry into a " custodial interrogation ". As for defendant Glover — prior to questioning *him*, he was actually taken into custody by the police. Admittedly, neither Williams nor Glover was warned at any time that they had the right to remain silent; that anything they said could be used against them in a court of law; that they had the right to the presence of an attorney and that if they could not afford an attorney, and they so desired, one would be appointed for them prior to any questioning (*Miranda*, p. 444).

As a consequence, none of Williams' statements made after his first fateful answer, to the effect that he resided in the apartment in question, may be levelled against *him* as evidence at *his* trial. And none of the statements made by Glover at any time may be levelled against Glover at Glover's trial.

If the exposure of the contraband were the result of the statements thus ruled out, then as to the person making them, it would be " fruit of the poisoned tree " and both such utterances and contraband should be suppressed. But the contraband here was exposed as the result of a constitutionally permissible search of premises incidental to a valid arrest of Blakely on those premises. Its exposure under no stretch of the imagination can be said to depend on any unlawfully compelled statements charged to defendants Williams and Glover.

It is settled by now that once contraband is lawfully exposed to police view and seized, if subsequently it can be lawfully connected to anyone at all, an arrest of that person is lawful and the contraband may be used as evidence against him. Of course, if the connection depends on unlawfully obtained admissions of a particular accused, neither his arrest nor the use of the contraband as evidence as against *him* will be justified. On the other hand, if the connection depends on the utterances of an accomplice made prior to any inquiry put to a particular accused, both the latter's arrest and the use of the contraband as evidence against the latter are justified.

On the foregoing reasoning, Williams' statement to the effect that he resided in the apartment in question, in my opinion, is sufficient in itself lawfully to connect Williams to the contraband later exposed, and sufficient also to furnish the " probable cause " necessary for his arrest which followed. The contra-

band thus legitimately having been connected to him, it may not be suppressed as evidence in a trial as against defendant Williams.

On the foregoing reasoning also, Williams' statements throughout are sufficient in themselves to furnish the connection between the contraband and defendant Glover, and, by the same token, to furnish the "probable cause" necessary for Glover's arrest. The contraband thus legitimately having been connected to him, it may not be suppressed as evidence in a trial as against defendant Glover.

Defendant Glover cannot be heard to argue that the statements of Williams are hearsay in the context of an admissibility hearing. Hearsay testimony is permissible if it is proved to be reliable. The statements of Williams inculpate both defendants and in view of their tendency to incriminate or degrade Williams, they are entitled to a high order of credibility. Moreover, Glover cannot take advantage of a violation of Williams' constitutional rights. He stands or falls on his own. "It is doubtful whether one defendant may move to suppress an unconstitutional confession (admission) made by his co-defendant on the ground that it will prejudice him at the trial. Since such a confession (admission) does not constitute evidence against the non confessing defendant, in theory at least, it is not prejudicial." (The New Confession Standards — Miranda v. Arizona, Sobel, 1966; Criminal Law Bulletin, Inc., Gould Publications, p. 135; matter in parentheses ours.)

There will, of course, be additional problems on the trial, particularly if defendants are not separately tried. I do not reach those problems on this "admissibility" hearing.

The motion is granted as to all *statements* made by both defendants with the exception of defendant Williams' admission that he resided in the apartment in question at the time of the search in question; the motion, to the extent that it seeks the suppression of the contraband (marijuana) as evidence at the trial is denied as to both defendants.