STATE OF NORTH CAROLINA v. MAUDE MAY CLAY

No. 7815SC671

(Filed 19 December 1978)

**Criminal Law § 75.7— custodial interrogation in defendant's home—absence of specific waiver of counsel**

   In this felonious assault prosecution, defendant's inculpatory statements resulted from custodial interrogation rather than from a general on-the-scene investigation where five police officers went to defendant's home at 1:05 a.m. in answer to a call about a domestic disturbance; defendant told officers at 1:10 a.m. that another person shot the victim; two officers went to the hospital to check on the victim while two other officers stayed in defendant's home; the two officers who went to the hospital returned to defendant's home at 3:10 a.m.; officers interrogated defendant in her home at 3:10 a.m. and defendant stated that she shot the victim; officers were present in defendant's home at all times between 1:05 a.m. and 3:10 a.m. when she made the inculpatory statements; and it is clear that suspicion had focused on defendant at the time of the second interrogation. Therefore, the trial court erred in the admission of defendant's inculpatory statements where defendant did not specifically waive her right to counsel prior to the second interrogation.

   Judge MARTIN (Harry C.) dissenting.

APPEAL by defendant from *Martin, Judge (John C.)*. Judgment entered 17 February 1978 in Superior Court, ALAMANCE County. Heard in the Court of Appeals on 14 November 1978.

Defendant was charged in a proper indictment with assault with a deadly weapon with intent to kill, inflicting serious bodily injury. Upon her plea of not guilty, the State presented evidence tending to show the following:

On 3 September 1977, Nathaniel Cleo Evans went to the defendant's house around 11:00 p.m. and became involved in an altercation precipitated by the defendant's refusal to give him a bowl of cooked okra. Evans testified that he then left the premises but later returned and was invited into the house by the defendant's brother, Verla Turner. Evans further testified that once he was inside the house, the defendant's brother drew a knife on him, and he then proceeded to walk out the back door. As he pushed the door open, he was shot in the leg, suffering serious injury that required hospitalization for over two months.

The Burlington police investigated the shooting and questioned the defendant at 1:15 a.m. and later that same morning at

3:10 a.m. After a *voir dire* hearing, the trial judge concluded that all of the statements made by defendant to the police "were the result of an on-the-scene investigation rather than a custodial interrogation" and allowed them into evidence. In response to questions of the police, the defendant stated that her brother was attempting to leave the house, that when he opened the door Evans hit him with a chair, that she then shot Evans, and that she would have shot him again if her brother had not restrained her.

The defendant presented evidence tending to show that Evans was drunk at the time of the shooting, that he had pulled a knife on her brother earlier in the night, that he had threatened to kill her earlier in the evening, and that he had a reputation as a violent and fighting man.

The jury found defendant guilty of assault with a deadly weapon inflicting serious injury. From a judgment imposing a sentence of four to five years, defendant appealed.

*Attorney General Edmisten, by Assistant Attorney General James Wallace, Jr., for the State.*

*Lee & Johnson, by Angela R. Bryant, for the defendant appellant.*

HEDRICK, Judge.

Defendant assigns as error the admission into evidence of inculpatory statements made by her to Detective G. W. Barrow and Officer O. E. Perry at about 3:10 a.m. Before the defendant's statements were admitted, a *voir dire* hearing was conducted outside the hearing of the jury. The State's evidence on *voir dire*, except where quoted, is summarized below:

Detective G. W. Barrow testified that he had gone to the defendant's home in response to "a call which indicated that there was a domestic problem at the residence." Three other police officers in addition to Detective Barrow and Officer Perry also arrived at the scene. Barrow stated, "I approached Mrs. Clay shortly after I arrived at the residence and saw Mr. Evans injured." He explained, "We did not know that there had been a shooting until we talked with Mrs. Clay. At the first instance we talked to her, there was nobody in the house except Mrs. Clay, the victim

and police officers." The first statement was made by the defendant to the police officers at 1:10 a.m., about seven or ten minutes after they had arrived at her home. After the defendant was advised of her constitutional rights under the law, "[s]he did not request a lawyer." Barrow stated, "Before I talked to Mrs. Clay, I did not have a suspect in mind. She was not under arrest or in custody." In her first statement to the police, "Mrs. Clay told [Detective Barrow] that Mr. Evans had been shot with a shotgun and that Mr. Turner had shot Mr. Evans. She said that Mr. Turner had already left." After Detective Barrow took the defendant's first statement, he and Officer Perry left to go to the hospital and two other police officers stayed at the house. Barrow testified that prior to his leaving, the defendant "was not under arrest and was not told not to leave her residence." A second statement was taken by Officer Perry from the defendant at approximately 3:10 a.m. at her residence and was tape recorded. Barrow testified that "Mrs. Clay was reminded that she had already been advised of her constitutional rights when she made the second statement. She was asked whether or not she understood those rights and she said that she could take care of herself." The officers did not obtain a written waiver of rights from the defendant, although Detective Barrow stated that "[n]ormally when we take a recorded statement of this type, it is our habit and procedure to get a written waiver of rights." Barrow further testified that "[t]here were police officers at Mrs. Clay's house at all times from 1:05 a.m. until 3:10 a.m. when we took the statement" and that to his knowledge, Mrs. Clay did not leave the premises during that period of time. Barrow noted "I guess she could have left the premises at any time if she had wanted to" and that she "was never threatened or coerced into giving a statement or promised anything." Police obtained from Mr. Turner a waiver of his rights which was signed on a waiver of rights advisory sheet.

The defendant testified, "The house seemed full of policemen. There were a lot of them. More than three." Regarding her first statement to the police, defendant testified, "I talked to some police officers about the shooting before I made the recorded statement. I told the police that Mr. Evans had come in the house kicking and choking me and that I had the gun. Mr. Turner fell back against me, and the gun went off." Mrs. Clay testified, "I

feel I could have left the house before I made the statement if I had wanted to go, and I don't think they would have tried to stop me." The defendant added, however, "I did not leave the house before I made the recorded statement. Day was breaking when I left home."

Explaining what transpired when she left after the police had recorded her statement, defendant stated, "I did not ask them could I leave, but I went to crank my car. I blew my horn because I was blocked in by their cars and they said I could not get out. But they said I could walk out. So I shut my car door and walked around the house and left them in the back yard searching."

After the *voir dire* hearing, the Court made findings and conclusions, relevant portions of which are quoted below:

[T]hat Officer Barrow advised Mrs. Clay of her constitutional rights under the Miranda decision . . .

Mrs. Clay did not request an attorney, but did not specifically waive an attorney; and that the officers then asked her what had happened, whereupon she replied and gave a voluntary statement to the effect that Mr. Evans had been shot with a shotgun and that Mr. Turner had shot Mr. Evans . . .

[A]gain at approximately 3:10 a.m. Officer Barrow and Officer Perry returned to the Clay residence, having been to the Alamance County Hospital to determine the status of the victim, and upon returning to the Clay residence had in their possession a tape recorder; that during the period of time in which they were absent from the Clay residence the defendant was not in custody or detained in any manner and felt that she could have left the house at any time; that the officers thereafter asked the defendant questions and interrogated the defendant and that she voluntarily answered the questions; that such interrogation was conducted in connection with an on-the-scene investigation of a crime and not as a result of any custodial interrogation and that at the time of the second interrogation and answers given by the defendant, the defendant had not been placed under arrest and had not been told that she could not leave the residence and was in no manner detained even though officers had remained present there at the residence during the entire period of

absence of Officers Perry and Barrows [sic] and that prior to asking Mrs. Clay any questions at the time of the second interrogation Mrs. Clay was reminded of the rights which she had previously been given at approximately 1:10 a.m.

That although the Miranda warnings were given at the time of the 1:15 a.m. interrogation, such warnings were not required in that such interrogation and statements made by reason thereof were the result of an on-the-scene investigation and that the statements made by the defendant at that time were voluntarily and freely made . . .

That the statements given by the defendant at the 3:10 a.m. interrogation were the result of an on-the-scene investigation rather than a custodial interrogation, the defendant not having been detained, arrested, or taken into custody, and that statements given by the defendant at that time were given voluntarily, freely, and understandingly without duress, coercion, or inducement . . .

Since the trial court found as a fact that the defendant, after being advised of her constitutional rights, did not "specifically waive an attorney," and since waiver of the right to counsel cannot be presumed from a silent record, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966); *State v. Siler*, 292 N.C. 543, 234 S.E. 2d 733 (1977); *State v. Blackmon*, 280 N.C. 42, 185 S.E. 2d 123 (1971), we direct our inquiry to defendant's contention that the trial judge erred in finding and concluding that defendant's inculpatory statements made and recorded at about 3:10 a.m. on 4 September 1977 were not the result of a "custodial interrogation" but were answers made in response to "general on-the-scene questioning."

The United States Supreme Court, in its decision in *Miranda*, set forth certain constitutional rights which must be given to an individual who is the subject of a "custodial interrogation" by police officers. The Supreme Court, in *Miranda*, defined a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed. 2d at 706, *accord, State v. Martin*, 294 N.C. 702, 242 S.E. 2d 762 (1978); *State v. Meadows*, 272 N.C. 327, 158 S.E. 2d 638 (1968). In *Miranda*, the Court noted:

> Our decision is not intended to hamper the traditional func-
> tion of police officers in investigating crime . . . Such in-
> vestigation may include inquiry of persons not under
> restraint. General on-the-scene questioning as to facts sur-
> rounding a crime or other general questioning of citizens in
> the fact finding process is not affected by our holding.

384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed. 2d at 725, *accord, State
v. Blackmon, supra.*

In determining whether police questioning constituted a
"custodial interrogation" or a "general on-the-scene questioning,"
courts have considered the following factors as relevant: (1) the
nature of the interrogator, *People v. Cesare*, 55 App. Div. 2d 959,
391 N.Y.S. 2d 424 (1977) (four armed police officers); (2) the time
and place of the interrogation, *Oregon v. Mathiason*, 429 U.S. 492,
97 S.Ct. 711, 50 L.Ed. 2d 714 (1977) (state patrol office); *Orozcu v.
Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed. 2d 311 (1969) (in de-
fendant's bedroom at 4:00 a.m.); (3) the degree to which suspicion
had been focused on the defendant, *Beckwith v. United States*,
425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed. 2d 1 (1976); *People v. Glover*,
52 Misc. 2d 520, 276 N.Y.S. 2d 461 (1966); (4) the nature of the in-
terrogation, *State v. Blackmon, supra*, (spontaneous response to a
neutral question); *Commonwealth v. Sites*, 427 Pa. 486, 235 A. 2d
387 (1967) (questioning designed to elicit a confession); (5) the ex-
tent to which defendant was restrained or free to leave, *Orozcu v.
Texas, supra*; *State v. Martin, supra*, (defendant voluntarily went
to police station, was not considered a suspect, was not under ar-
rest or restrained in any manner), *State v. Dennis*, 16 Wash. App.
417, 558 P. 2d 297 (1976) (officer stated defendant was free to
leave at any time but remained in position where he could
restrict defendant's freedom of movement). *See also*, Annot.,
"What Constitutes 'Custodial Interrogation' Within Rule of *Miran-
da v. Arizona*," 31 A.L.R. 3d 565 (1970) and cases cited therein.

While none of the above factors standing alone is deter-
minative of the issue, they are all relevant in deciding whether
police questioning constitutes a "custodial interrogation." The
questioning did occur in the defendant's home. However, we
believe that any lessening of "the compelling atmosphere inherent
in the process of in-custody interrogation" resulting from defend-
ant being in familiar surroundings is largely vitiated by the fact

that five police officers went to the defendant's residence and that officers were present in her home at all times until she had made the inculpatory statements. The defendant was questioned on two separate occasions over a period of hours from 1:00 a.m. until after 3:00 a.m. The statements made by the officers that they did not have a suspect in mind prior to their initial questioning of the defendant should be accorded little weight in light of the fact that the officers persisted in their questioning until the defendant made the incriminating statements sometime after 3:00 a.m. The statements made by the defendant were clearly elicited by the police interrogation and could in no sense be considered spontaneous or volunteered responses to neutral questions. The testimony of Detective Barrow that the defendant was free to leave at any time and was not "under arrest," clearly a self-serving statement, is also not determinative of the issue. Defendant was interrogated at her home in the early hours of the morning. Even if the defendant had wanted to leave her home at that hour, she likely had nowhere to go. According to her testimony, the one time she left her house to go to the bathroom the police even followed her into her back yard.

The fact that defendant was allowed to leave after the officers had tape recorded her statement and was not formally charged until around 7:00 a.m., is likewise not dispositive. The defendant testified that when she did attempt to leave in her automobile, the police refused to move their cars which were blocking her and told her that she was free to walk away. It would be highly artificial to limit "custodial interrogation" to questioning that occurs only after a formal arrest. In such a situation, the police would need only to delay the formal arrest of the accused in order to circumvent the constitutional safeguards dictated by *Miranda*.

It is clear that suspicion had focused on the defendant at the time of the second interrogation. Officer Perry and Detective Barrow, after having been told by the defendant that her brother shot Evans, had gone to the hospital "to check the condition of Evans and had returned with a tape recorder" to further their interrogation of the defendant. We think it is significant that the police officers had undertaken to give the defendant her *Miranda* warnings before the 1:10 a.m. interrogation, and reminded her before the second interrogation at 3:10 a.m. that she had already

State v. Clay

been advised of her constitutional rights. Clearly the officers felt that their interrogation on both occasions was custodial and required that the defendant be advised of her rights. It is likely that the police officers believed defendant had sufficiently waived her right to counsel, and it would be unrealistic to suppose that they would be aware that the defendant's waiver of counsel could not be presumed from a silent record.

We are cited by the State to the case of *State v. Parrish*, 32 N.C. App. 636, 233 S.E. 2d 690 (1977) in support of its contention that defendant's inculpatory statement here was the result of a noncustodial interrogation. The cited case held that the defendant had been given his *Miranda* warnings, and that the statements were voluntarily and understandingly made. The language in the case that the defendant's incriminating statement was the result of an on-the-scene investigation and not a custodial interrogation is dictim, and, although correct under the facts of that case, is no support to the State's contentions here. We are likewise advertent to the cases of *Oregon v. Mathiason, supra*; *Beckwith v. United States, supra*; *State v. Meadows, supra*. In our opinion, these cases are clearly distinguishable on the facts, and they merely point out that the question whether an inculpatory statement is the result of a custodial interrogation is to be decided on the presence or absence of certain factors unique to the factual situation in each case.

In our opinion, in the present case the evidence adduced on *voir dire* and the findings of fact made by the trial judge do not support the conclusion that the defendant's inculpatory statements "were the result of an on-the-scene investigation rather than a custodial interrogation." In our opinion, the evidence in the present case demonstrates a "coercive environment" rendering the 3:10 a.m. statements of the defendant inadmissible in the absence of any evidence showing that she affirmatively waived her right to counsel.

We hold the court's error in admitting the 3:10 a.m. inculpatory statement was clearly prejudicial and that the defendant is entitled to a new trial.

Because of our disposition of the case, it is unnecessary to discuss defendant's remaining assignments of error.

New trial.

Judge MORRIS concurs.

Judge MARTIN (Harry C.) dissents.

Judge MARTIN (Harry C.) dissenting.

I respectfully dissent. Before turning to the legal question raised on this appeal, there are several statements in the majority opinion (not in the recitation of facts) I feel must be mentioned. They are:

1. "The defendant was questioned on two separate occasions over a period of hours from 1:00 a.m. until after 3:00 a.m." The record shows the officers received a call at approximately 1:05 a.m. to go to the scene. Defendant made her first statement to the officers about 1:10 a.m., some seven to ten minutes after they arrived. This statement was exculpatory. These officers then left to go to the hospital. Although other officers remained at the scene, there is no evidence that anyone other than Barrow and Perry talked with defendant. They returned at approximately 3:10 a.m., when they took the second statement from defendant. So the evidence indicates the officers talked to defendant for a few minutes about 1:10 a.m. and a few minutes about 3:10 a.m. and not "over a period of hours."

2. "[T]hat the officers persisted in their questioning until the defendant made the incriminating statements sometime after 3:00 a.m." The defendant on voir dire testified the police asked her, "Who shot Nate? . . . I told them that I shot Nate. They didn't ask me any more questions after that." This is all the evidence found in the voir dire record concerning the question asked defendant and her reply. Surely this cannot properly be categorized as "persistent" questioning.

3. "Even if the defendant had wanted to leave her home at that hour, she likely had nowhere to go." That the defendant had "nowhere to go" is irrelevant to the question of whether she was in custody at that time.

4. "[T]he police officers had undertaken to give the defendant her *Miranda* warnings . . .." Clearly the officers felt that their in-

terrogation . . . was custodial . . .." The majority seeks to show that *Miranda* warnings were required by showing they were attempted to be given. This is putting the cart before the pony. The giving of *Miranda* warnings does not sustain the conclusion that the interrogation was custodial. It is the custodial interrogation that requires the officers to comply with *Miranda*.

5. "It is clear that suspicion had focused on the defendant at the time of the second interrogation." The voir dire evidence discloses that at the time of the second questioning, 3:10 a.m., all the officers' information indicated Turner had shot Evans. No one had given them information that defendant had shot Evans prior to their taking defendant's second statement. It is submitted that the voir dire record does not sustain the majority's statement.

The legal question involved in this appeal is whether the court erred in denying defendant's motion to suppress her inculpatory statement. Two witnesses testified at the voir dire hearing on this motion, the defendant and Officer Barrow. Their testimony is short, and the portions essential to this appeal may be summarized as follows:

DETECTIVE BARROW:

I did not have a suspect in mind before I talked to defendant. She was not under arrest or in custody. I gave her the *Miranda* warnings. [1:10 a.m.] She said Turner shot Evans. She said Turner had left. We had answered a call about a domestic disturbance at defendant's home. The first statement was taken about 1:10 a.m., some seven to ten minutes after we arrived.

We [Barrow and Perry] went to the hospital and returned about 3:10 a.m. We did not advise her of *Miranda* at that time. She was not under arrest or in custody or being detained in any way. She was never threatened or coerced into giving a statement or promised anything.

There were police officers at the house at all times from 1:10 a.m. to 3:10 a.m. Two other officers stayed there when we went to the hospital. Defendant did not leave during that time. I guess she could have left if she had wanted to. I later talked to Turner about 3:50 a.m. We had no information defendant had shot Evans before the 3:10 statement. We did not tell her not to leave when we went to the hospital.

DEFENDANT CLAY:

Two cars of police came to the house. John Henry Clapp was in the dining room with me. The police [at 3:10 a.m.] asked me, "Who shot Nate?" I told them I shot Nate. They didn't ask any more questions after that. I left the house after I made the [3:10 a.m.] statement. Day was breaking when I left home. I did not ask them if I could leave. My car was blocked in by the police cars, but they said I could walk out.

I feel I could have left the house before I made the statement if I had wanted to go, and I don't think they would have tried to stop me.

I was not arrested at my house that night. I was not threatened to get me to answer questions. I knew I did not have to talk to the police and that I could have a lawyer.

I had been beaten up and was upset, mad and nervous. But not because of the police. I felt safe then.

I was arrested about 7:00 a.m. that morning.

Based upon the voir dire evidence, the court made findings of fact and conclusions of law. The court concluded as a matter of law that the statements given by defendant were the result of an on-the-scene investigation by the officers, rather than custodial interrogation, and denied the motion to suppress.

Whether a statement made by a defendant is competent as evidence is a question to be determined by the trial judge upon evidence presented to him in the absence of the jury. *State v. Outing*, 255 N.C. 468, 121 S.E. 2d 847 (1961), *cert. denied*, 369 U.S. 807, 7 L.Ed. 2d 555 (1962). Findings of fact made by the trial judge are conclusive if supported by competent evidence in the record. We may not properly set aside or modify those findings if so supported. *State v. Barber*, 278 N.C. 268, 179 S.E. 2d 404 (1971). The trial court's findings of fact are supported by the testimony of Barrow and Clay. These findings support the conclusion that defendant was not in custody when questioned by the officers and such statements by defendant were admissible as evidence. Our Supreme Court has recognized the difference between on-the-scene questioning and custodial interrogation condemned by

*Miranda. State v. Shedd*, 274 N.C. 95, 161 S.E. 2d 477 (1968). The test for custodial interrogation is whether defendant has been taken into custody or deprived of freedom of action in any significant way. *State v. Meadows*, 272 N.C. 327, 158 S.E. 2d 638 (1968).

In applying this test to the evidence received on voir dire, the facts clearly support the court's conclusion that defendant was not in custody at the time of the 3:10 a.m. statement and that it was made by defendant freely and voluntarily and understandingly, without duress, coercion, or inducement.

In *People v. Hazel*, 252 Cal. App. 2d 412, 60 Cal. Rptr. 437 (1967), the court held the custody requirement of *Miranda* was to be determined by the reasonable belief or intent of the suspect, rather than that of the officer, where suspect has not been arrested or physically deprived of his freedom of action. The voir dire evidence sustains the result that defendant Clay did not reasonably believe that her freedom of action was restricted. All the evidence is to the contrary.

In *People v. Glover*, 52 Misc. 2d 520, 276 N.Y.S. 2d 461 (1966), the court held one of the criteria for distinguishing on-the-scene questioning and custodial interrogation depended upon the subjective intent of the officer. Does the officer have a reasonable belief that the person he is questioning is a suspect? If during the questioning the officer forms a reasonable belief that the person is a suspect, the questioning becomes custodial interrogation. *Miranda* warnings must be given before questioning may lawfully continue. "But *Miranda* cannot be tortured to 'throw back' to his first fateful answer so as to bring that first answer within the ambit of 'custodial interrogation' as defined in *Miranda*. Nothing in *Miranda*, suggests that it does!" *Id.* a 527, 276 N.Y.S. 2d at 467. The voir dire evidence sustains the conclusion that defendant was not a suspect until after the 3:10 a.m. statement. *State v. Martin*, 294 N.C. 702, 242 S.E. 2d 762 (1978).

An investigation that is focused on the defendant as a suspect does not, in itself, require the application of the principles of *Miranda*. The interrogation must be custodial in nature before the requirements of *Miranda* are necessary. *Beckwith v. United States*, 425 U.S. 341, 48 L.Ed. 2d 1 (1976). (Beckwith was interrogated by I.R.S. officers in a house sometimes occupied by him. The Court held it was not a custodial interrogation and *Miranda*

not required, even though the investigation had focused on Beckwith.) *Smith v. Commonwealth,* 248 S.E. 2d 135 (1978).

The majority suggests that the presence of police officers in defendant's home created a "compelling atmosphere" or a coercive environment. Defendant, to the contrary, said the presence of the officers did not make her nervous or afraid and that she felt safe. In *Oregon v. Mathiason,* 429 U.S. 492, 50 L.Ed. 2d 714 (1977), the Court concluded that a mere coercive environment, absent any formal arrest or physical restraint of freedom, was not a custodial interrogation within the meaning of *Miranda.* " '[A]ny interview . . . by a police officer will have coercive aspects to it.' " *Id.* at 495, 50 L.Ed. 2d at 721.

I find this case within the facts and holding in *State v. Meadows, supra.* In *Meadows,* police officers received a call a shooting had occurred and went to the scene to investigate. They found the victim there, wounded. The officer asked defendant what had happened and defendant replied, "I shot him." Although this testimony was evidently offered to impeach defendant, the Court's opinion was before *Harris v. New York,* 401 U.S. 222, 28 L.Ed. 2d 1 (1971), which approved the use of a confession without *Miranda* warnings to impeach a defendant. Justice Bobbitt (later Chief Justice) based the Court's opinion on the conclusion that defendant was not in custody and that although defendant was a suspect, the question was a part of a general investigation by the officers and not an in-custody interrogation. In *State v. Martin, supra,* the facts are analogous to the case at bar. The Court relied on *Mathiason, supra,* and held the statements were not a result of custodial interrogation.

I find the evidence on voir dire supports the trial court's conclusion that the defendant's inculpatory statement was not the result of custodial interrogation and was voluntary.

From a reading of the entire charge of the court, defendant's second assignment of error appears to be without merit.

For these reasons, I find no error in the trial.